E-FILED
Friday, 23 April, 2010   04:11:19 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| SANDRA GRAACK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 10 |
| v. ) | |
| ) | **JURY DEMAND** |
| MIDWEST SENIOR CARE NETWORK, INC. ) | |
| d/b/a HEALTH RESOURCES ALLIANCE, INC., ) | |
| ) | |
| Defendant. ) | |

**COMPLAINT**

Now comes the Plaintiff, Sandra Graack, by Richard L. Steagall, her attorney, and complaining of the Defendant, Midwest Senior Care, Inc. d/b/a Health Resources Alliance, Inc., for her claims states:

**I.
Jurisdiction & Venue**

1.Jurisdiction over this action asserting claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq and Americans With Disabilities Act, 42 U.S.C. § § 12111 et seq. Supplemental jurisdiction to hear the claims under the Illinois Human Rights Act, 775 ILCS 5/2-102, 5/6-101, 5/7A-102 (D)(3); 5/10-102 (a) under 28 U.S.C. § 1367 (a).

2.Plaintiff is a resident of Peoria County, Illinois and was employed by Defendant at its nursing home in Peoria County, Illinois. Venue in this court exists under 28 U.S.C. § 1391. The case is assigned to the Peoria Division of this court under Local Rule 40.1.

3.The occurrence complained of happened on **February 16, 2009** in Peoria County, Illinois.

**II.**

## The Parties

4. Plaintiff Sandra Graack is 56 years old and was 55 at the time of her employment termination. She has been a licensed Physical Therapist Assistant for the past 20 years. She was employed by Health Alliance from August 15, 1994 until her employment termination on February 16, 2009. She was assigned to the Lutheran Home in Peoria, Illinois from 1994 to a time in 1996 and then was assigned to the Bell-Wood Nursing Home in Peoria, Illinois.

5. Defendant Midwest Senior Care, Inc. d/b/a Health Resources Alliance, Inc ("Health Alliance") is a corporation engaged in the business of providing rehabilitation services at various locations including in nursing homes in Peoria County, Illinois. It is an employer within the meaning of the Age Discrimination in Employment Act, the Americans With Disabilities Act, and the Illinois Human Rights Act.

## III.
## The Incidents

6. Graack is a 56 year old woman (55 years at the time of the incident) who had a total right knee replacement in 1999, a 2002 torn rotator cuff, and in 2004 another torn rotator cuff.

7. Graack had a June 24, 2008 examination by Brian Maurer, M.D., an orthopedic surgeon for fluid in her right knee. Dr. Maurer diagnosed her condition as Baker's cyst, a collection of fluid on the back of her right knee. The fluid was caused by a loose portion of orthotodics used in her 1999 knee replacement surgery.

8. Dr. Maurer stated his opinion that the orthotodics were loose, but stable and could be treated by exercises and a knee brace. Dr. Maurer stated the exercises and knee brace would stabilize the orthotodics and the fluid would go away, which is what happened.

9 Graack informed her employment supervisor, Jennifer Hoven, of the fluid on her knee and Dr. Maurer's diagnosis and treatment. Dr. Maurer's records were available to Hoven. Despite being informed of Dr. Maurer's diagnosis and the successful treatment, Hoven would regularly asked Graack about her leg for the remainder of her employment Graack responded each time that she was fine as the knee brace and exercise solved the problem.

10 Graack and Physical Therapy Assistants attended a meeting on or about December 18,2008. After the meeting, Graack had a conference with Candy Kupris, Area Manager and Jennifer Hoven, Program Manager, who was Graack's supervisor.

11. Kupris and Hoven expressed doubts about Graack's ability to treat patients and did not accept Graack's assurances that her age and past physical disabilities did not affect her ability to perform the work.

12. Kupris and Hoven told Graack it was time for her to think about retirement. Graack responded that she did not want to retire and the physician confirmed that she is physically able to do the work.

13. Courtney McGhee, Central Illinois Area Regional Manager, came to the Bell-Wood Nursing Home on January 23, 2009. After a meeting, McGhee questioned Graack about her leg, Graack responded it was fine, and McGhee followed up with an email suggesting a medication her mother used for a loose orthotodic.

14. On February 6, 2009, Graack received a written disciplinary warning from Candy Kupris, Area Manager, Julie Lofthouse, Physical Therapist. Each of the charges on which the warning and three days suspension without pay was based were false.
Candy Kupris told Graack when she gave her the disciplinary warning stating, we are all getting older and it is time for you to think about retiring and getting off your legs.

15. The corrective action provided in the written discipline was to place all her patient charts in the box of the Physical Therapist for her review and signature. This was not required of the other Physical Therapy Assistant and had never been required Graack.

   A. Graack returned to work on Thursday, February 12,2009, completed the patient charts, placed them in the box of Julie Lofthouse, Physical Therapist. The charts were returned unsigned. Graack asked Jennifer Hoven whey the charts were not signed who replied she did not know anything about it.

   B. Graack treated a patient on February 12, 2009, but could not write the note of the treatment because Jennifer McNulty, the other Physical Therapy Assistant had the chart and Graack was required to leave because her shift had ended. It was a requirement of employment that the Physical Therapy Assistants leave immediately at the end of their shift and not stay in the building even to complete charts.

16. Graack worked on Friday, February 13,2009, completed the patient chart as soon as Jennifer McNulty appeared at work and gave her the chart that Graack was unable to compete when her shift ended on Thursday, Februazy 12, 2009. A delay in completion of charts from an afternoon shift that had ended and the chart was unavailable until the next morning is not unusual.

17. Graack came to work on Monday, February 16, 2009 and was met by Candy Kupris, Area Manager, Jennifer Hoven, Program Manager and Graack's supervisor. Kupris informed Graack that her employment was terminated for the following:

    A. Graack did not have the patient chart signed by Julie Lofthouse, Physical Therapist, on February 12, 2009. Lofthouse refused to sign the chart when Graack asked her.

    B. Graack did not have the patient chart that was unavailable to her at the end of her afternoon shift on February 12, 2009 completed. Her completion of the chart when it was available to her the next morning after February 12, 2009 was unacceptable.

18. The reasons given for Graack's termination were a false pretext for age and disability discrimination.

## IV.
## Plaintiff's Claims

**A. Statutes Involved**

19. At all times material, there was in full force and effect in the United States a certain statute, the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq which provided;

**§ 623 Prohibition of age discrimination**

(a) Employer practices

It shall be unlawful for an employer--

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

(3) to reduce the wage rate of any employee in order to comply with this chapter.

20.   At all times material, there was also in full force and effect in the United States a certain statute known as the Americans With Disabilities Act, 42 U.S.C. § 12111 et seq as amended by the Americans With Disabilities Amendments Act of 2008, which provided:

**§ 12102 Definition of Disability**

As used in this chapter:

(1) Disability

The term "disability" means, with respect to an individual--

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment (as described in paragraph (3)).

(2) Major life activities

> (A) In general
>
> For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.
>
> (B) Major bodily functions
>
> For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

(3) Regarded as having such an impairment

For purposes of paragraph (1)(C):

(A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

(B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

(4) Rules of construction regarding the definition of disability

The definition of "disability" in paragraph (1) shall be construed in accordance with the following:

(A) The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.

(B) The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

(C) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.

(D) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(E)(i) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as--

(I) medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;

(II) use of assistive technology;

(III) reasonable accommodations or auxiliary aids or services; or

(IV) learned behavioral or adaptive neurological modifications.

(ii) The ameliorative effects of the mitigating measures of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

(iii) As used in this subparagraph--

(I) the term "ordinary eyeglasses or contact lenses" means lenses that are intended to fully correct visual acuity or eliminate refractive error; and

(II) the term "low-vision devices" means devices that magnify, enhance, or otherwise augment a visual image.

**§12111 Definitions**

(1) Commission

The term "Commission" means the Equal Employment Opportunity Commission established by section 2000e-4 of this title.

(2) Covered entity

The term "covered entity" means an employer, employment agency, labor organization, or joint labor-management committee.


(8) Qualified individual

The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

(5) Employer

(A) In general

The term "employer" means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person, except that, for two years following the effective date of this subchapter, an employer means a person

engaged in an industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year, and any agent of such person.

### § 12112 Discrimination

(a) General rule

No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

### § 12117 Enforcement

(a) Powers, remedies, and procedures

The powers, remedies, and procedures set forth in sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment

21. At all times material, there was in full force and effect in the State of Illinois a certain statute known as the Illinois Human Rights Act, 775 ILCS 5/1-101 et seq. (2008), which provided:

### § 1-102. Declaration of Policy.

It is the public policy of this State:

(A) Freedom from Unlawful Discrimination. To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, order of protection status, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations.

**§ 1-103. General Definitions.**

When used in this Act, unless the context requires otherwise, the term:

(A) Age. "Age" means the chronological age of a person who is at least 40 years old, except with regard to any practice described in Section 2-102, insofar as that practice concerns training or apprenticeship programs. In the case of training or apprenticeship programs, for the purposes of Section 2-102, "age" means the chronological age of a person who is 18 but not yet 40 years old.

(B) Aggrieved Party. "Aggrieved party" means a person who is alleged or proved to have been injured by a civil rights violation or believes he or she will be injured by a civil rights violation under Article 3 that is about to occur.

(C) Charge. "Charge" means an allegation filed with the Department by an aggrieved party or initiated by the Department under its authority.

(D) Civil Rights Violation. "Civil rights violation" includes and shall be limited to only those specific acts set forth in Sections 2-102, 2-103, 2-105, 3-102, 3-102.1, 3-103, 3-104, 3-104.1, 3-105, 3-105.1, 4-102, 4-103, 5-102, 5A-102, 6-101, and 6-102 of this Act.

(F) Complaint. "Complaint" means the formal pleading filed by the Department with the Commission following an investigation and finding of substantial evidence of a civil rights violation.

(G) Complainant. "Complainant" means a person including the Department who files a charge of civil rights violation with the Department or the Commission.

(H) Department. "Department" means the Department of Human Rights created by this Act.

(I) Disability. "Disability" means a determinable physical or mental characteristic of a person, including, but not limited to, a determinable physical characteristic which necessitates the person's use of a guide, hearing or support dog, the history of such characteristic, or the perception of such characteristic by the person complained against, which may result from disease, injury, congenital condition of birth or functional disorder and which characteristic: ...

... (J) Marital Status. "Marital status" means the legal status of being married, single, separated, divorced or widowed.

(J-1) Military Status. "Military status" means a person's status on active duty in or status as a veteran of the armed forces of the United States, status as a current member or veteran of any reserve component of the armed forces of the United States, including the United States Army Reserve, United States Marine Corps Reserve, United States Navy Reserve, United States Air Force Reserve, and United States Coast Guard Reserve, or status as a current member or veteran of the Illinois Army National Guard or Illinois Air National Guard.

(K) National Origin. "National origin" means the place in which a person or one of his or her ancestors was born.

(K-5) "Order of protection status" means a person's status as being a person protected under an order of protection issued pursuant to the Illinois Domestic Violence Act of 1986 or an order of protection issued by a court of another state.

(L) Person. "Person" includes one or more individuals, partnerships, associations or organizations, labor organizations, labor unions, joint apprenticeship committees, or union labor associations, corporations, the State of Illinois and its instrumentalities, political subdivisions, units of local government, legal representatives, trustees in bankruptcy or receivers.

(M) Public Contract. "Public contract" includes every contract to which the State, any of its political subdivisions or any municipal corporation is a party.

(N) Religion. "Religion" includes all aspects of religious observance and practice, as well as belief, except that with respect to employers, for the purposes of Article 2, "religion" has the meaning ascribed to it in paragraph (F) of Section 2-101.

(O) Sex. "Sex" means the status of being male or female.

(O-1) Sexual orientation. "Sexual orientation" means actual or perceived heterosexuality, homosexuality, bisexuality, or gender-related identity, whether or not traditionally associated with the person's designated sex at birth. "Sexual orientation" does not include a physical or sexual attraction to a minor by an adult.

(P) Unfavorable Military Discharge. "Unfavorable military discharge" includes discharges from the Armed Forces of the United States, their Reserve components or any National Guard or Naval Militia which are classified as RE-3 or the equivalent thereof, but does not include those characterized as RE-4 or "Dishonorable".

(Q) Unlawful Discrimination. "Unlawful discrimination" means discrimination against a person because of his or her race, color, religion, national origin, ancestry, age, sex, marital status, order of protection status, disability, military status, sexual orientation, or

unfavorable discharge from military service as those terms are defined in this Section.

**§ 2-101. Definitions**.

The following definitions are applicable strictly in the context of this Article.

(A) Employee.

(1) "Employee" includes:

(a) Any individual performing services for remuneration within this State for an employer;

(b) An apprentice;

(c) An applicant for any apprenticeship.

(2) "Employee" does not include:

(a) Domestic servants in private homes;

(b) Individuals employed by persons who are not "employers" as defined by this Act;

(c) Elected public officials or the members of their immediate personal staffs;

(d) Principal administrative officers of the State or of any political subdivision, municipal corporation or other governmental unit or agency;

(e) A person in a vocational rehabilitation facility certified under federal law who has been designated an evaluee, trainee, or work activity client.

(B) Employer.

(1) "Employer" includes:

(a) Any person employing 15 or more employees within Illinois during 20 or more calendar weeks within the calendar year of or preceding the alleged violation;

(b) Any person employing one or more employees when a complainant alleges civil rights violation due to unlawful discrimination based upon his or her physical or mental handicap unrelated to ability or sexual harassment;

(c) The State and any political subdivision, municipal corporation or other governmental unit or agency, without regard to the number of employees;

(d) Any party to a public contract without regard to the number of employees;

(E) Sexual Harassment. "Sexual harassment" means any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

(F) Religion. "Religion" with respect to employers includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

(G) Public Employer. "Public employer" means the State, an agency or department thereof, unit of local government, school district, instrumentality or political subdivision.

(H) Public Employee. "Public employee" means an employee of the State, agency or department thereof, unit of local government, school district, instrumentality or political subdivision. "Public employee" does not include public officers or employees of the General Assembly or agencies thereof.

(I) Public Officer. "Public officer" means a person who is elected to office pursuant to the Constitution or a statute or ordinance, or who is appointed to an office which is established, and the qualifications and duties of which are prescribed, by the Constitution or a statute or ordinance, to discharge a public duty for the State, agency or department thereof, unit of local government, school district, instrumentality or political subdivision.

(K) Citizenship Status. "Citizenship status" means the status of being:

    (1) a born U.S. citizen;

    (2) a naturalized U.S. citizen;

    (3) a U.S. national; or

(4) a person born outside the United States and not a U.S. citizen who is not an unauthorized alien and who is protected from discrimination under the provisions of Section 1324b of Title 8 of the United States Code, as now or hereafter amended.

**§ 2-102. Civil Rights Violations--Employment.**

It is a civil rights violation:

(A) Employers. For any employer to refuse to hire, to segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination or citizenship status.  ....

**7A-102. Procedures.**

(A) Charge.

(1) Within 180 days after the date that a civil rights violation allegedly has been committed, a charge in writing under oath or affirmation may be filed with the Department by an aggrieved party or issued by the Department itself under the signature of the Director.

(2) The charge shall be in such detail as to substantially apprise any party properly concerned as to the time, place, and facts surrounding the alleged civil rights violation.

**§ 10-102. Court Actions**.

(A) Circuit Court Actions.

(1) An aggrieved party may commence a civil action in an appropriate Circuit Court not later than 2 years after the occurrence or the termination of an alleged civil rights violation or the breach of a conciliation or settlement agreement entered into under this Act, whichever occurs last, to obtain appropriate relief with respect to the alleged civil rights violation or breach. ....

**B.      The Federal & State Claims**

15.     The conduct of Health Alliance set forth in Part III ¶ 5-17 above was age and

disability discrimination in employment and retaliation in violation of the Age Discrimination in

Employment Act, 29 U.S.C. § 621 et seq, the Americans With Disabilities Act, 42 U.S.C. §

12111 et seq as amended by the Americans With Disabilities Amendments Act of 2008, 42 U.S.C. § 12101 & 12102 and the Illinois Human Rights Act.775 ILCS 5/2-202 (a) (2008).

## V.
## Relief Sought

22. As a direct and proximate result of the discrimination in employment of Health Alliance, Graack was damaged in that she lost income she would have received during the remainder of her nine years of employment until the age of 65 in the amount of $56,472 ($27.15 per hour x 2080 hours per year) (40 x 52) per year plus benefits the calculation of which is unavailable now, further Graack has suffered mental distress from the termination of her employment.

23. Graack is entitled to an award of the attorney's fees and expenses incurred in prosecuting this action as a prevailing plaintiff under the Age Discrimination in Employment Act 29 U.S.C. § 626 (b) and the Americans With Disabilities Act. 42 U.S.C. § 12117 which incorporates the remedies of Title VII of the Civil Rights Act of 1964 and the Illinois Human Rights Act.. 42 U.S.C. § 2000e-5 (k); 775 ILCS 5/8A-104 (G).

## VI.
## Satisfaction of Conditions for Bringing This Action

24. Graack filed a Charge of Discrimination with the Illinois Department of Human Rights which was simultaneously filed with the Equal Employment Opportunity Commission under the agency work sharing agreement on April 23, 2009. Ill. Dept. Human Rights Case No. 2009 CA 3564; EEOC 21 B 2009-01993. A true copy of the Charge of Discrimination is attached as Ex:1. The April 23, 2009 filing of the Charge of Discrimination was within the 180 time period for filing such charges after the April 30, 2008 employment action provided the

Illinois Human Rights Act and the 300 days provided for filing such charges in States which have an agency for discrimination charges. 775 ILCS 5/7A-102 (a)(1); 42 U.S.C. § 2000e-5 (e)(1).

25. The Illinois Department of Human Rights on Graack's request for a right to sue letter entered an Order of Closure approving withdrawal of the Charge of Discrimination which included a request for a right to sue from the Equal Employment Opportunity Commission.

26. The Equal Employment Opportunity Commission issued a Notice of Right to Sue sent by certified mail on March 1, 2010. This action is filed on April 25, 2010 which is within the 90 days of Graack's receipt of the March 1, 2010 EEOC Notice of Right to Sue. A true copy of the Notice of Right to Sue is attached as Ex:2.

27. Graack has satisfied the conditions for bringing this action imposed by Title VII. 42 U.S.C. § § 2000e-5 (e)(1), (f)(1).

## VII.
## Prayer for Relief

**WHEREFORE**, Plaintiff, Sandra Graack, prays for judgment against the Defendant, Midwest Senior Care Network, Inc., d/b/a Health Resources Alliance, Inc. in the amount of SEVEN HUNDRED FIFTY THOUSAND DOLLARS ($750,000) plus costs of suit including the reasonable attorney's fees and expenses incurred in prosecuting this action under 29 U.S.C. § 62_ and 42 U.S.C. § 12117 incorporating the remedies of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 (k) and the Illinois Human Rights Act, 775 ILCS 5/8A-104 (G) (2008).

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Respectfully submitted,

s/ Richard L. Steagall
RICHARD L. STEAGALL,
Attorney for the Plaintiff

RICHARD L. STEAGALL
Nicoara & Steagall
Commerce Building
416 Main Street, Suite 815
Peoria, IL 61602
Tel: (309) 674-6085
Fax: (309) 674-6032
nicsteag@mtco.com